J-A05007-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION AND RELINQUISHMENT OF PARENTAL RIGHTS TO D.J.L., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.G., MOTHER | : : : | |
| | : | No. 1992 EDA 2020 |

Appeal from the Decree Entered September 22, 2020
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
No. A2019-0066

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION AND RELINQUISHMENT OF PARENTAL RIGHTS TO H.L.K.L., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.G., MOTHER | : : : | |
| | : | No. 1993 EDA 2020 |

Appeal from the Decree Entered September 22, 2020
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
No. A2019-0067

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION AND RELINQUISHMENT OF PARENTAL RIGHTS TO M.K.G., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.G., MOTHER | : : : | |
| | : | No. 1994 EDA 2020 |

Appeal from the Decree Entered September 24, 2020
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
No. A2019-0068

J-A05007-21

BEFORE:   OLSON, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                        **FILED:  MAY 17, 2021**

In this consolidated appeal,[1] L.G. ("Mother") appeals from the decrees and orders entered on September 22 and 23, 2020, as amended on September 23 and filed on September 24, 2020, granting the petitions filed by the Lehigh County Office of Children and Youth Services ("LCOCYS" or the "Agency") to terminate her parental rights to her minor children, D.J.L. (a male born in May 2011), H.L.K.L. (a female born in July 2012), and M.K.G. (a female born in May 2017), pursuant to the Adoption Act, 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b).[2]  We affirm.

LCOCYS filed petitions to involuntarily terminate Mother's parental rights to D.J.L., H.L.K.L. and M.K.G. on September 30, 2019.  Trial Court Opinion, 9/22/20, at 2.  LCOCYS also filed a petition asking that the biological father of M.K.G. be declared unknown and unascertainable.[3]  *Id.*  Hearings were held

_____

[*] Former Justice specially assigned to the Superior Court.

[1] In a November 19, 2020 *per curiam* order, this Court consolidated the three appeals *sua sponte*.

[2]  We note that LCOCYS also filed petitions to involuntarily terminate the parental rights of D.J.L., Sr., the biological father of D.J.L. and H.L.K.L.  D.J.L., Sr. voluntarily relinquished his parental rights on September 22, 2020.  **See** Trial Court Opinion, 9/22/20, at 2 n.1.

[3]  Over the course of this case, five men were named as potential fathers to M.K.G., none of which were a positive DNA match.  One man, K.L., failed to attend his appointment for paternity and, despite proper notice *via* publication, failed to attend or communicate further with LCOCYS.

- 2 -

on January 21 and February 7, 2020,[4,5] after which the trial court made the

following findings of fact:

. . .

6. Mother has a lengthy history with LCOCYS. Her parental rights to four of her children were previously terminated in Lehigh County. The Agency originally became involved with D.[J.L.] and H.[L.K.L.] at birth because both children tested positive for PCP and cocaine. (N.T. 1/21/[20] at 7,10, 15-16, 35-36, and 134; N.T. 2/7/[20] at 79-80.)

7. LCOCYS obtained emergency custody of D.[J.L.] and H.[L.K.L.] shortly after their births, and both children were adjudicated dependent: D.[J.L.] on June 9, 2011 and H.[L.K.L.] on August 23, 2012. Mother was ordered to obtain and maintain stable housing and legal income, attend a dual-diagnosis mental health and drug and alcohol treatment program, submit to urinalysis to demonstrate sobriety, consistently attend scheduled visitation, cooperate with the Agency, and advise the Agency of any changes in her contact information. (N.T. 1/21/[20] at 11-12, 16-17.)

8. Initially, Mother made little to no progress toward reunification with her children, but in 2012 she began to turn her situation around such that by May 16, 2013, both children had been returned to Mother's care. The [j]uvenile [c]ourt terminated supervision regarding both children as of July 29, 2013. (N.T. 1/21/[20], at 13-22.)

9. In February of 2017, LCOCYS caseworker Cheryl Leddy became involved with the family when the Agency received a referral that H.[L.K.L.] had been sexually abused by an 18-year-old male who was not a family member. At the time, H.[L.K.L.] was four or five

---

[4] Two separate transcripts were filed on February 7, 2020. We adopt the delineation of the trial court wherein "N.T. 2/7/20" refers to the proceedings in open court and "N.T. 2/7/20, Vol. II" refers to the in-camera interview of D.J.L. and H.L.K.L.

[5] Throughout the pendency of this case at the trial court and appellate levels, Mother was represented by Attorney Catherine L. Pierce and all three children were represented by Attorney Michael E. Moyer.

years old and was living with her brother[,] D.[J.L.], Mother and a friend. (N.T. 1/21/[20] at 22-23; N.T. 2/7/[20] at 28.)

10. Law enforcement was already involved when Ms. Leddy reached out to Mother to work with her regarding the abuse of H.[L.K.L.] Mother was responsive; however, after the Agency recommended that Mother take the child for a Child Abuse and Neglect Trauma Assessment, Mother missed several appointments before finally completing the intake appointment and did not return with the child for any treatment. (N.T. 1/21/[20] at 24.)

11. On May 10, 2017, the Agency received another referral of a general protective services nature and assigned an in-home service provider to work with the family. Mother met with the provider on occasion but missed several appointments. This service was still in place when M.[K.G.] was born later in May of 2017. (N.T. 1/21[20] at 25.)

12. On January 24, 2018, the Agency received another referral indicating that H.[L.K.L.] was sexually abused, this time by a household member who was the paramour of an aunt living in the same home with Mother, D.[J.L.], H.[L.K.L.], M[.K.G.], and other relatives. The resulting Child Protective Services Investigation went Indicated. (N.T. 1/21/[20] at 28; N.T. 2/7/[20] at 31-34.)

13. On January 28, 2018, Mother was arrested while driving on a suspended license and was incarcerated at Lehigh County Jail ("LCJ") for drug-related offenses for a number of days before she posted bail. (N.T. 1/21/[20] at 31, 33, [and] 80; N.T. 2/7/[20] at 73-74.)

14. On January 30, 2018, the Agency obtained emergency custody of M[.K.G.] and placed her into foster care, where she remained at the time of the termination hearing. At the time, D.[J.L.] and H.[L.K.L.] were already in the custody of their father, in Franklin County, as he had been notified to pick up his children. (N.T. 1/21/[20] at 28, 30-31, [and] 33-34.)

15. [After a hearing held on February 8, 2018,] M.[K.G.] was adjudicated dependent [in an] order entered February 26, 2018. On April 19, 2018, the [j]uvenile [c]ourt made a finding of aggravated circumstances against Mother regarding M.[K.G.] based on the prior involuntary termination of Mother's parental rights to four of her other children. Nevertheless, the [c]ourt

ordered Mother to cooperate with the following recommendations in order to have M.[K.G.] safely returned to Mother's care:

1) Maintain sobriety and submit random urinalysis to demonstrate sobriety.

2) Complete a drug and alcohol evaluation and follow through with any recommendations therefrom.

3) Complete a parenting capacity evaluation and cooperate with any recommendations therefrom.

4) Attend visitation as scheduled by the Agency.

5) Resolve criminal charges.

Mother was not incarcerated at the time but had pending drug-related criminal charges. (N.T. 1/21/[20] at 34, [and] 36-38).

16. On March 26, 2018, Franklin County Children and Youth Services received emergency custody of D.[J.L.] and H.[L.K.L.]; the children were adjudicated dependent on April 16, 2018 and were placed in foster care in Franklin County. In August 2018, the dependency cases of D.[J.L.] and H.[L.K.L.] were transferred from Franklin County to Lehigh County. D.[J.L.] and H.[L.K.L.] were placed in the kinship home of Maria Vega; Ms. Vega was D.[J.L.]'s caregiver when he was adjudicated dependent as an infant, and she adopted four of Mother's older children who are full siblings of D.[J.L.] and H.[L.K.L.] (N.T. 1/21/[20] at 11-12, [and] 39-40.)

17. Permanency review hearings took place on April 19, 2018 with respect to M.[K.G.] only and on August 9, 2018, November 29, 2018, February 21, 2019,[6] and August 22, 2019 with respect to all three children. (N.T. 1/21/[20] at 4, 53, 55, [and] 64.)

---

[6] Following the February 21, 2019 hearing, the [j]uvenile [c]ourt made a finding of aggravated circumstances against Mother regarding D.[J.L.] and H.[L.K.L.] based on Mother's prior involuntary termination of her parental rights to four of her other children. (N.T. 1/21/[20] at 61-62.)

18. Mother attended four of the five permanency review hearings. She attended the April 19, 2018, of her own volition, but she was incarcerated for the four other review hearings. She was either transported from LCJ or was able to participate by telephone from the jail in Franklin County. However, she did not attend the review hearing on February 21, 2019; she had been recently incarcerated at LCJ, but the Agency was unaware she was at LCJ until after the hearing. (N.T. 1/21/[20] at 4, 36, 53, 55-56, [and] 63.)

19. On August 22, 2019, at the last permanency review hearing, Mother was ordered to comply with the following services:

    1) Participate in supervised visitation.

    2) Resolve all criminal charges.

    3) Complete a protective parenting evaluation and follow through with any recommendations.

    4) Obtain and maintain appropriate housing and legal income.

At the time, she was incarcerated on parole violations and new escape charges for absconding from work release. (N.T. 1/21/[20] at 63.)

20. Mother's criminal history extends from 2008 through 2019. Her other offenses include felony and misdemeanor charges of fraud, theft, and numerous charges for possession of drugs as well as multiple [d]riving [u]nder the [i]nfluence offenses (hereafter, "DUIs"). (N.T. 1/21/[20] at 135.)

21. Since the time Ms. Leddy became involved with the family in February of 2017, Mother incurred new criminal charges for offenses committed in Lehigh County on the following dates:

    1) April 1, 2017 (fraud);

    2) July 8, 2017 (retail theft and conspiracy);

    3) January 28, 2018 (possession of controlled substances);

    4) April 10, 2018 (possession of controlled substances and DUI);

    5) April 26, 2018 (possession of controlled substances); and

6) May 22, 2019 (escape).

She was sentenced to all of these charges at once. (N.T. 2/7/[20] at 118-119.)

22. In addition to the Lehigh County offenses enumerated above, during the pendency of the dependency proceedings in this case, Mother also incurred charges in Franklin County for possession of marijuana, for which she was subsequently convicted. (N.T. 2/7/[20] at 120-121 [and] 136.)

23. As a result of these criminal offenses, Mother has been subject to numerous incarcerations, both for new offenses and as well as for parole violations. Ms[.] Leddy and Mother both testified regarding Mother's frequent incarcerations during the pendency of the dependency proceedings:

1) at LCJ for one week in 2017 a few months after M.[K.G.] was born;

2) at LCJ from January 28, 2018 through January 30, 2018 or for up to a week (Mother testified she was at LCJ for a week);

3) in Franklin County from March 5, 2018 through April 3, 2018, at which time she was transferred to LCJ;

4) at LCJ from April 3, 2018 through April 5, 2018, at which time she was released;

5) at LCJ from April 26, 2018 through October 16, 2018, at which time she was transferred back to Franklin County;

6) at Franklin County from October 16, 2018 through December 28, 2018, where she served the maximum sentence and was released;

7) at LCJ from February 18, 2019 through May of 2019, when she was transferred to work release; however, she absconded from work release on May 22, 2019; and

8) at LCJ from July 3, 2019, where she remained at the time of the termination hearing in this matter.

(N.T. 1/21/[20] at 33, 38-39, 64, 80-82, [and] 119; N.T. 2/7/[20] at 30-31 [and] 73-74.)

- 7 -

24. Since January 2018 when LCOCYS obtained emergency custody of M.[K.G.] until the date of the termination hearing, Mother was out in the community only 83 days, not including the time she was on the run after absconding from work release. (N.T. 1/21/[20] at 70.)

25. Since August of 2019, Mother has refused to meet with the LCOCYS caseworker, Ms. Leddy, and has refused to speak with her. (N.T. 1/21/[20] [at] 100-101; 131; N.T. 2/7/[20] at 88-89 [and] 94-95.)

26. Mother has not made any progress with the court-ordered services intended to help her reunify with the children:

1) Mother has not obtained any substance abuse treatment in the past three and a half years. (N.T. 1/21/[20] at 135.)

2) She has not attended urinalysis to demonstrate sobriety, except for one sample she provided in August of 2017, which was positive for cocaine. (N.T. 1/21/[20] at 134.)

3) She has not obtained, or even tried to set up, a parental capacity evaluation.[7] (N.T. 1/21/[20] at 37 [and] 70-71; N.T. 2/7/[20] at 93-94.)

4) She did not follow through with completing a protective parenting assessment. (N.T. 1/21/[20] at 133.)

5) She did not demonstrate to the Agency that she had obtained stable housing or a legal source of income. (N.T. 1/21/[20] at 70.)

6) Although she tried to comply with the visitation of her children, her ability to participate was severely hampered by her incarcerations and her decision to abscond from work

---

[7] We note that Mother initially objected to the recommendation that she undergo such an evaluation, but the court ordered the evaluation over her objection. (N.T. 1/21/[20] at 36-37.). The purpose of the evaluation was to address the sexual abuse of H.[L.K.L.] that occurred twice while she was in Mother's care as well as the previous involuntary termination of parental rights to other children that occurred before D.[J.L.], H.[L.K.L.], and M.[K.G.] came into the Agency's care. (N.T. 1/21/[20] [at] 139.)

release. (N.T. 1/21/[20] at 49, 56, 64-65, [and] 91-92. **See also infra** ¶¶45-46.)

27. Mother completed programs for anger management, relapse prevention, living skills, healthy relationships, decision making, and a parenting class while incarcerated. However, none of the programs fulfill any of Mother's court-ordered requirements to help her safely reunify with her children. (N.T. 1/21/[20] at 69-70 [and] 140; N.T. 2/7/[20] at 55-59 [and] 86-88.)

28. Mother is no closer to reuniting with her children now than she was when they were taken into agency custody. (N.T. 1/21/[20] at 72.)

29. M.[K.G.] continues to live in the same foster home in which she was originally placed in February of 2018 when she was approximately nine months old. Her foster mother is an adoptive resource for M.[K.G.], who is the only child in the home and has thrived there throughout the dependency proceedings. All of her emotional, medical and physical need are being met, and she is strongly bonded to her foster mother. (N.T. 1/21/[20] at 30-31, 54, 67, 72-73, [and] 148.)

30. Unlike their sister M.[K.G.], D.[J.L.] and H.[L.K.L.] have had an uphill struggle since coming into the custody of LCOCYS. Initially, they expressed that they did not want to have visits with Mother. Due to difficulties regulating their emotions and behavior, they began to receive therapeutic services, separately, through Pinebrook in September of 2018. After a psychiatric evaluation, medication was recommended for each of them and, over Mother's objection, was approved by the court. (N.T. 1/21/[20] at 52, 54, 64-67, 71-72, 161-162, [and] 175.)

31. After being in therapy for a period of time, both children made disturbing disclosures to their therapist. (N.T. 1/21/[20] at 163-166.)

32. H.[L.K.L.] disclosed that Mother encouraged her and her brother, D.[J.L.], to perform sexual acts with one another under a blanket while Mother and her adult friends watched. H.[L.K.L.] also disclosed that Mother hit D.[J.L.] and H.[L.K.L.] with hangers (N.T. 1/21/[20] at 163-165.)

33.  D.[J.L.] disclosed numerous instances of physical and verbal abuse, including being hit by hangers and being slapped.  He also described an incident  in which Mother placed a gun in D.[J.L.]'s hand and used his finger to squeeze the trigger when they were out driving at night, and he recalled seeing the resulting spark of fire.  He would have been six years old or younger at the time.  (N.T. 1/21/[20] at 166.)

34.   D.[J.L.] and H.[L.K.L.] both disclosed verbally abusive behavior from Mother.  (N.T. 1/21/[20] at 163.)

35.   The therapist who has worked with both children since September 2018 described that during periods [when] Mother was not involved, such as when she escaped from work release, D.[J.L.] and H.[L.K.L.] felt calmer and safer.  She explained that the children have a high degree of tension and anxiety when Mother is back in their lives and visits are scheduled.  D.[J.L.]'s anxiety over visits was especially heightened:  He was resistant to going to the visits, and when he would learn that a visit was planned for the next day, he would throw tantrums and say that he did not want to go.  Most of the time, both children had increased difficulties both before and after the visits with Mother.  (N.T. 1/21/[20], at 167, 169-170, [and] 172.)

36.  D.[J.L.] and H.[L.K.L.] both refer to Mother by her first name, a source of tension during one of Mother's visits with the three children at LCJ.  (N.T. 1/21/[20] at 146-147, [and] 163.)

37.  D.[J.L.] and H.[L.K.L.] continue to live with Maria Vega, their maternal great aunt, and with four of their full siblings whom Ms. Vega legally adopted after Mother's parental rights were terminated.  Ms. Vega is an adoptive resource for D.[J.L.] and [H.L.K.L.] as well.  They are happy in the home and are doing well in school.  They are still working with their therapist at Pinebrook, and Ms. Vega cooperates with the therapist and consistently takes them to all their appointments.  She ensures that their medical, emotional, and academic needs are met.  D.[J.L.] and H.[L.K.L.] feel comfortable and safe in Ms. Vega's home and have a close relationship with Ms. Vega's husband.  The children call them "Mom" or "Mommy" and "Daddy" and would like to continue living there.  (N.T. 1/21/[20] at 11-12, 40, 71-73, 143-146, 152-153, [and] 171; N.T. 2/7/[20] at 134-135; N.T. 2/7/[20] Vol. II at 9, 11, 16-17, 28, 34, 37, [and] 40.)

38. The children's caregivers facilitate sibling visits and ongoing contact between D.[J.L.], H.[L.K.L.], and M.[K.G.] (N.T. 1/21/[20] at 54; N.T. 2/7/[20] Vol. II at 29.)

39. D.[J.L.] and H.[L.K.L.] each expressed during in-camera interviews that they dislike visits with Mother in the jail because she yells at them; however, H.[L.K.L.] initially said the visits make her happy and that she would be sad if visits stopped. (N.T. 2/7/[20] Vol. II at 13, 30, 37, [and] 39-40.)

40. Mother testified about her own traumatic background. After her mother died when she was 12 years old, she was in and out of foster homes and group homes. She was adjudicated delinquent and sent to Danville Center for Adolescent Females, where she obtained her GED in 1998 or 1999 when she was approximately 16. She had her first of nine children at age 17. Her first four children were adopted. Her fifth child lives with his father. Her sixth child was adopted. The three youngest children are D.[J.L.], H.[L.K.L.], and M.[K.G.] She has been the victim of sexual assault. (N.T. 2/7/[20] at 9-11, 71-77, 96, 113, [and] 127.)

41. Mother testified that she has had problems with substance abuse since she was 19 or 20 years old. She is addicted to cocaine and PCP and has had problems with alcohol and marijuana as well. Her drug of choice is PCP. She was unable to identify the last day she used. She admitted she has relapsed more than once. (N.T. 2/7/[20] at 84, 103, 106, [and] 121.)

42. She has been diagnosed with PTSD, depression, anxiety, and bipolar disorder. (N.T. 2/7/[20] at 83-84.)

43. She testified she did pursue both mental health treatment and substance abuse treatment in the past, first at Step by Step and later at [the Hispanic American Organization (hereafter, "HAO")]. She worked particularly well with a counselor at HAO named Fawny. When Fawny died in 2013 or 2014, it was an especially difficult loss for Mother because of the strength of the therapeutic relationship she and Fawny had formed. (N.T. 2/7/[20] at 22-27.)

44. Mother testified she obtained a dual diagnosis evaluation with Step by Step in April 2018, which resulted in a recommendation for outpatient treatment. Mother explained she contacted [HAO]

to obtain that treatment but was jailed before she could start the process. However, she did not provide written documentation to Ms. Leddy. (N.T. 1/21/[20] at 36-39 [and] 94.)

45. [Mother] was candid about her criminal charges, arrests, incarcerations, and parole violations, admitting she pled guilty to retail theft in 2008 and again in 2018 (stemming from an offense in 2017), to possession of cocaine in 2018, and to possession of marijuana in Franklin County. She admitted she has had two or three DUI's for driving under the influence of alcohol, as well as two convictions for possession of cocaine in Lehigh County. She admitted she violated her parole on at least three of her criminal cases. (N.T. 2/7/[20] at 30, 73-75, 115-121, [and] 139.)

46. Mother testified that while she was in prison, her visits with D.[J.L.], H.[L.K.L.], and M.[K.G.] were very important to her, and she kept a calendar of the visits. She also wrote to her prison counselor when the children did not attend visitation. She testified she saw D.[J.L.] and H.[L.K.L.] only once in 2018, on August 16, and she had eight visits with them in 2019 and three visits in January of 2020. She had additional visits with M.[K.G.] She felt the children were happy at visits and described they would scream, "Mommy," and run to her. (N.T. 2/7/[20] at 49-53; N.T. 1/21/[20] at 51.)

47. [Mother] admitted that when she was on work release, she was permitted to leave the facility to visit D.J.L., H.[L.K.L.] and M.[K.G.] on May 22, 2019, but she absconded for 42 days until the uncle with whom she was staying turned her in after they had a disagreement. She was aware that she could not visit D.[J.L.], H.[L.K.L.], and M.[K.G.] while she was on the run, yet she testified that she has no regrets for her actions. (N.T. 2/7/[20] at 75, 97, 100, [and] 126.)

48. At the time of the termination hearing, Mother had been continuously incarcerated since July 2, 2019 and anticipated being released on February 22, 2020, but she will be under supervised probation or parole for at least eight months. (N.T. 2/7/[20] at 61, 67, [and] 123.)

49. Upon her release, Mother will have to pay costs and fines of over $10,000. (N.T. 2/7/[20] at 130.)

50. Conditions of Mother's probation are that she must participate in mental health and drug and alcohol counseling, provide urine screens to demonstrate sobriety, and obtain and maintain legal income and housing – essentially the same requirements imposed by the court in the dependency case. (N.T. 2/7/[20] at 93.)

51. Her plan upon release is to live with a friend temporarily and search for housing; to try to gain employment with a former employer with whom she had a good experience; to try to reinstate SSI and SSD as sources of income; to obtain medical benefits from the Pennsylvania Department of Health and Human Services through Compass; and to set up mental health and her drug and alcohol counseling at Haven House. At the time of the hearing in this matter, her plan had not yet been approved, and the only portion of the plan that Mother knew was actually set up was for her medical benefits through Compass. (N.T. 2/7/[20] at 18-21, 61-66, [and] 141-144.)

52. In 2018, Seroquel, Vistaril, Prozac, and Topomax were prescribed for her in the prison for her mental health diagnoses. She felt the medications were helping her. She was seeing both a psychotherapist and a psychiatrist while in prison and received the medications through LCJ. She testified that she will fill the prescriptions when she is released. (N.T. 2/7/[20] at 69-70 [and] 95.)

53. She admitted that she was unable to demonstrate whether she is "a good mother" because she was incarcerated, and that she had been incarcerated throughout the majority of the dependency case. (N.T. 2/7/[20] at 69-70 [and] 95.)

54. Mother's perspective is that she is changing gradually and she is trying to be the best that she can. She felt the time in the prison was helpful to her recovery, and she explained when she is released, she planned to maintain her progress. She expressed she wants a chance and an opportunity to do what she can for her children, but she was unable to describe the time frame she will need. She was 38 years old as of the date of the termination hearing. (N.T. 2/7/[20] at 70, 96, 113, [and] 140-141.)

55. Upon release, the Agency would require Mother to comply with all of the court-ordered services and to demonstrate stability for a significant period of time before considering returning the children to Mother's care. This would include completion of

> evaluations for protective parenting and parenting capacity and following through with any recommended treatment. (N.T. 1/21/[20] at 72; N.T. 2/7/[20] at 91-94.)

Trial Court Opinion, 9/22/20, at 3-11 (some citation and footnotes omitted; footnotes [6] and [7] above are found in original text). Based on these findings of fact, the trial court determined LCOCYS proved by clear and convincing evidence that Mother's parental rights should be terminated under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). ***See generally*** Trial Court Opinion, 9/22/20, at 12-22.

Mother raises the following issues on appeal:[6]

I. Did the trial court commit an error of law or abuse of discretion in its determination that LCOCYS sustained its burden of proof by clear and convincing evidence that the statutory standards set forth in 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8) had been met?

II. Did the trial court commit an error of law or abuse of discretion in its determination that LCOCYS sustained its burden of proof by clear and convincing evidence that the termination of parental rights best meets the developmental, physical and emotional needs and welfare of the child as required by 23 Pa.C.S.A. § 2511(b)?

Appellant's Brief at 4.

---

[6] Mother filed a notice of appeal together with a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) on October 15, 2020 in each of the three separate cases pertaining to each child, respectively. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on October 20, 2020, expressly relying on its September 22, 2020 opinion entitled "Adjudication." This Court consolidated the appeals in an order filed November 19, 2020.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.* As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As [the Supreme Court] discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. [The Supreme Court] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support a [different] result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012) (some citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). As we

have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.*, *quoting **In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003).

> Termination requires a bifurcated analysis:
>
> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if th[is C]ourt determines that the parent's conduct warrants termination of his or her parental rights do[ we] engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

**In re L.M.**, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We first will analyze Section 2511(a) before turning to Section 2511(b).

Regarding Section 2511(a), Mother argues "it appears that Mother's biggest hurdle to reunification with her children was her lengthy period of on and off imprisonment throughout the duration of this matter." Appellant's Brief at 13. She argues that the trial court erred because her time imprisoned should not be determinative of the outcome of this matter. *Id.* at 15. Mother argues that she made the most of her time in prison by completing several classes, cooperating with mental health and medication management, and

participating in visitation with the children. *Id.* at 13-14. Further, she argues that the conditions causing the children's placement soon would be alleviated by her upcoming release from prison, after which she intended to obtain housing, legal income, and mental health and drug and alcohol services. *Id.* at 14. Mother's argument fails.

Section 2511(a) provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

- 17 -

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * * *

23 Pa.C.S.A. § 2511(a).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We conclude that termination was proper under Section 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." **In re C.M.K.**, 203 A.3d 258, 262 (Pa. Super. 2019) (citation omitted). The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. **In re Z.P.**, 994 A.2d 1108, 1117 (Pa. Super. 2010).

"[A] parent's incarceration is relevant to [a] [S]ection [2511](a)(2) analysis, and depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control, or subsistence' that the section contemplates." **In re A.D.**, 93 A.3d 888, 897

(Pa. Super. 2014) (citation omitted). Additionally, this Court has long recognized a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

Contrary to Mother's contention, Mother's incarceration, while not the sole evidence relied upon by the trial court, may be dispositive in this case. *See e.g. In re A.D., supra*. The record demonstrates that Mother has an extensive criminal history of felonies and misdemeanors, including new charges and/or parole violations incurred during the pendency of this case. Since the beginning of LCOCYS involvement in 2018, over two and a half years ago, Mother was incarcerated for all but 83 days. Moreover, Mother's argument fails to acknowledge the affirmative actions and choices which necessitate her criminal sanctions. As the trial court noted:

> [I]t is Mother's lengthy history of actions and choices that caused her to be incarcerated repeatedly and deprived the children of the essential parental care they require. Mother herself admits, "I know that - - that I haven't been doing my job as a parent, because I've been locked up and incarcerated. And I can't do anything while I'm here, so I can't prove that I am a good mother."

Trial Court Opinion, 9/22/20, at 17 (citation omitted).

Most notably, Mother actively chose to abscond from work release, a choice which resulted in failing to contact or support her children for multiple

months, incurring new charges of escape, lengthening her incarceration time, and limiting her visitation while re-incarcerated. Mother's active choices hold Mother in a repeated and continued pattern of criminal activity and incarceration which Mother cannot or will not remedy.

After careful review of the record, we note that the trial court did not rely on Mother's status of incarceration as the sole reason for termination. The trial court also noted if Mother were released when she expected, February 22, 2020, whether she will remedy the conditions which lead to her parental incapacity is "speculative at best." Trial Court Opinion, 9/22/20 at 18. Mother would be on probation for at least eight months and subject to the requirements therefrom, including payment of fines in excess of $10,000. Moreover, she still must meet the requirements of the trial court before the children would be returned to her. Thus far, Mother has failed to fulfill any of the requirements set for her, including a parental capacity evaluation, protective parenting evaluation, stable housing and income, or stability and sobriety. Trial Court Opinion, 9/22/20, at 18. Though Mother completed classes while incarcerated, none of them fulfilled the requirements of the trial court which were specifically ordered for Mother's situation, *i.e.*, H.L.K.L. being sexually assaulted twice while in her care and Mother already being subject to termination of her parental rights to four other children. We therefore discern no abuse of discretion in terminating Mother's parental rights pursuant to Section 2511(a)(2).

Next, we must consider whether Child's needs and welfare will be met by termination pursuant to Subsection (b). *See In re Z.P.*, 994 A.2d at 1121. Regarding Section 2511(b), Mother essentially argues that the trial court's credibility determinations were in error, where testimony from several witnesses raised "serious" or "legitimate" questions as to competence. *See* Appellant's Brief at 19. She argues evidence "that supports that Mother either will not or is not capable of attending to the developmental, physical and emotional needs of her children is scanty" and that the record holds evidence supporting an opposite result. *Id.* at 20. Mother's Section 2511(b) argument thus fails.

Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

In the context of a Section 2511(b) analysis, "the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P.*, 994 A.2d at 1121. The court is not required to use expert

testimony; social workers and caseworkers may offer evaluations as well. *Id.*

Ultimately, the concern is the needs and welfare of a child. *Id.*

We have stated:

[b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*In re Z.P.*, 994 A.2d at 1121, *quoting* *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000). A trial court may rely on a caseworker or social worker to determine the status of and nature of a parent-child bond. *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa. Super. 2018). The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). "[A] parent's basic constitutional right to the custody and rearing of . . . [his] child is converted, upon the failure to fulfill . . . [his] parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

A parent's abuse and neglect are likewise a relevant part of this analysis:

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (citations and quotations omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). Our Supreme Court has stated that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *See In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013), *quoting In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008). The Supreme Court stated, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *See In re: T.S.M.*, 71 A.3d at 267,

*quoting* ***In re Involuntary Termination of C.W.S.M.***, 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J. dissenting).

A close review of the record shows the trial court did not abuse its discretion or commit an error of law in concluding that the children's needs and welfare are best served by the termination of Mother's parental rights. While there is some evidence of a bond, such as H.L.K.L. testifying at one point that she felt happy during visits with Mother at the prison, and H.L.K.L. mentioned feeling "sad" if she never saw Mother again, both she and D.J.L. both testified to their preference to remain with Maria Vega.[7] Moreover, the evidence established Mother's verbal and physical abuse, and her awareness of, if not participation in, sexual abuse of H.L.K.L and D.J.L.

We also note the children's strong bonds with their respective foster parents. Testimony from caseworkers, therapists, and the children themselves establish that D.J.L. and H.L.K.L. refer to Maria Vega and her spouse as "Mommy" and "Daddy" and refer to Mother by her first name. M.K.G. has been at her current foster placement since she was eight months old and is thriving there. As the trial court stated, "Mother has essentially been relegated to the status of a visitor over the course of the past two and a half years." Trial Court Opinion,9/22/20, at 20. Ms. Vega and the foster parent of M.K.G. provide for the children's emotional, physical, and

---

[7] Attorney Moyer, as counsel for children, filed a brief in this case in which he indicated the children's preference was to remain with foster parents. ***See*** Brief of Participant Children (adopting the arguments of Appellee LCOCYS).

developmental well-being. The evidence also establishes that the children are thriving in their foster placements and are more stable during periods of Mother's absence. The foster parents ensure the children attend medical and mental health appointments. They coordinate visits between the children. In all respects, they provide a nurturing, safe, and supportive environment for D.J.L., H.L.K.L., and M.K.G.

Safety concerns for the children also support the trial court's termination determination. Mother's parental rights have been terminated to four other children prior to this case. Mother has nine children, but custody of none. She has a history of neglect, drug use, and instability. Mother refused to consent to doctor-recommended medication for D.J.L. and H.L.K.L. Moreover, Mother's own problems provide safety concerns to the children. At the time of the termination hearings, Mother had no definite plans for her release from prison. Her lack of a definitive income and housing plan poses a serious safety and security risk. The trial court determined, "[t]he record is void of credible evidence that more time or more services will empower Mother to adequately discharge her parental obligations and duties" to the children within a reasonable time. Trial Court Opinion, 9/22/20, at 19. The children's lives cannot be held in abeyance while Mother attempts to get her life on track. *In re C.B.*, 230 A.3d 341, 349 (Pa. Super. 2020).

As there is competent evidence in the record that supports the trial court's findings and credibility determinations, we find Mother's arguments unpersuasive. The evidence supports that, while a limited parent-child bond

may have existed between Mother and at least the two older children, these bonds could be severed without causing a detrimental effect on the children. Moreover, the record supports that the foster parents are in the best positions to satisfy the safety needs of the children by providing, *inter alia*, stability and security. Therefore, we discern no abuse of discretion or error of law on the part of the trial court.

Testimony also established that M.K.G. is thriving in her foster placement with foster parents who provide for her emotional, physical, and developmental well-being and that M.K.G. wishes to be adopted by them. Thus, we discern no abuse of discretion on the part of the trial court.

Orders and decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/17/21